IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KENNETH LUCERO,                          :

    Plaintiff,                           :

v.                                       :          Civil Action No. GLR-13-1036

WAYNE A. EARLY, et al.,                  :

    Defendants.                          :

## <u>**MEMORANDUM OPINION**</u>

THIS MATTER is before the Court on Defendant Mayor & City Council's ("Baltimore City" or the "City") Motion to Dismiss Count Two of the Second Amended Complaint (ECF No. 79) and Defendant Baltimore Police Department's ("BPD") Motion to Dismiss Plaintiff's Second Amended Complaint (ECF No. 80). In this 42 U.S.C. § 1983 (2018) action, Lucero challenges the City's and BPD's restrictions on leafletting near the First Mariner Arena (the "Arena") in Baltimore, Maryland, and his arrest for violating those restrictions. The Motions are ripe for disposition, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will deny the Motions.

# I.    BACKGROUND[1]

## A.    <u>Factual Background</u>

Baltimore City owns the First Mariner Arena (the "Arena"), located at 201 West Baltimore Street in Baltimore, Maryland. (2d Am. Compl. ¶ 10, ECF No. 77).[2] Every year, the City leases the Arena to the owners of Ringling Brothers Circus ("Ringling" or the "Circus") for almost two weeks, during which time Ringling holds daily performances. (<u>Id.</u> ¶ 12).

In 2004, apparently prompted by a 2003 incident in which a media van impeded the flow of traffic, the City and BPD "jointly formulated" a policy (the "Policy")[3] that restricted protestors', including leafletters', use of the sidewalk and plaza area surrounding the Arena during the Circus. (<u>Id.</u> ¶¶ 14–15). In effect, the Policy imposed a "buffer zone" around "all public entrances to the Arena" and "areas where Circus attendees are likely to walk."  (<u>Id.</u> ¶ 44). These restrictions prevent leafletters from being at a "conversational distance" from Circus patrons. (<u>Id.</u>). They are in place only when the Circus is at the Arena. (<u>Id.</u> ¶¶ 38–40). In addition, Defendant BPD officer Wayne A. Early ("Officer Early") and

---

[1] Unless otherwise noted, the Court takes the following facts from Lucero's Second Amended Complaint, (ECF No. 77), and accepts them as true. <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555–56 (2007)).

[2] The Court provided additional factual background in its September 11, 2018 Memorandum Opinion (ECF No. 68). The Court repeats only facts relevant to the pending Motion and will address additional facts when discussing applicable law.

[3] The Court uses the term "Policy" for the sake of simplicity. It is not intended as a conclusion—express or implied—that the restrictions on leafletting are a policy under <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978).

other BPD officers "in a widespread custom" enforce the Policy "only against those who oppose the Circus." (Id. ¶¶ 51, 80).

In April 2010, Ringling was in Baltimore for its annual daily performances. (See id. ¶¶ 55–56). On April 8, 9, and 10, 2010, Lucero "wanted to leaflet in restricted areas" but did not because Officer Early and other BPD officers threatened him with arrest based on the Policy. (Id. ¶ 55). On April 17, 2010, Lucero leafletted in a restricted area, and Officer Early arrested him for violating the Policy. (Id. ¶ 56). BPD detained Lucero for "several hours" at a booking facility. (Id. ¶ 60). BPD ultimately released Lucero without bringing any criminal charges against him. (Id.).

**B.    Relevant Procedural Background**

On April 8, 2013, Lucero sued Officer Early, the City, and BPD. (ECF No. 1). On October 17, 2014, Lucero filed an Amended Complaint. (ECF No. 24). On September 11, 2018, the Court granted the City's Motion to Dismiss Count Two of the Amended Complaint and BPD's Motion to Dismiss the Amended Complaint, dismissed Counts 2 and 3 without prejudice, and granted Lucero leave to file a second amended complaint. (Sept. 11, 2018 Mem. Op. at 22, ECF No. 68). Specifically, the Court concluded that Lucero failed to sufficiently allege that a final decisionmaker had implemented or approved the Policy. (Id. at 16–17).

Lucero filed a Second Amended Complaint on October 11, 2018. (ECF No. 77).[4] In his five-count Second Amended Complaint, Lucero alleges: direct liability for violations of his constitutional rights under § 1983 against Officer Early (Count 1); municipal liability for violations of his constitutional rights under § 1983 against the City and BPD, challenging the Policy as applied to the leafletters (Count 2); municipal liability for violations of his constitutional rights under § 1983 against BPD for discriminatory enforcement of the Policy (Count 3); False Arrest against Officer Early (Count 4); and violation of Article 26 of the Maryland Declaration of Rights against Officer Early (Count 5). (Id. ¶¶ 66–92). Lucero seeks damages, attorney's fees, and costs. (Id. at 24).

On November 13, 2018, the City filed its Motion to Dismiss Count Two of the Second Amended Complaint. (ECF No. 79). Lucero filed his Opposition on November 27, 2018. (ECF No. 81). On December 10, 2018, the City filed a Reply. (ECF No. 83).

Also on November 13, 2018, BPD filed its Motion to Dismiss Plaintiff's Second Amended Complaint. (ECF No. 80). Lucero filed his Opposition on November 27, 2018. (ECF No. 82). On December 11, 2018, BPD filed a Reply. (ECF No. 84).

## C.   <u>Ross v. Early Litigation</u>

In a related case, <u>Aaron Ross v. Wayne A. Early</u>, No. JFM-9-3255 (D.Md. closed Nov. 30, 2012), Aaron Ross sued BPD, the City, then-Commissioner Frederick H. Bealefeld, III, and three solicitors for the Baltimore City Law Department, alleging that the

---

[4] Officer Early filed an Answer to the Second Amended Complaint on November 5, 2018. (ECF No. 78).

Policy at issue in this case violated the First Amendment to the United States Constitution, both facially and as applied. Ross v. Early (Ross III), 899 F.Supp.2d 415, 418 (D.Md. 2012), aff'd, 746 F.3d 546 (4th Cir. 2014).[5] The Ross III Court denied BPD's and the City's motions for summary judgment regarding the constitutionality of the Policy. Id. at 425. In an earlier opinion, the Court concluded that the Policy was content-neutral, served a significant government interest, and provided sufficient alternative avenues for communication. Id. at 421 (citing Ross v. Early (Ross II), 758 F.Supp.2d 313, 320 (D.Md. 2010)). The Court further concluded that there was a genuine dispute of material fact regarding whether the Policy was narrowly tailored, which depended on the Policy's scope and the corresponding level of scrutiny. Id. at 425. As a result, the parties entered into a stipulation for the purposes of appealing the Court's ruling. Ross, 746 F.3d at 551. The Ross parties stipulated that the Policy applied generally to "all expressive activity" and not to "the activities of circus and animal welfare street protesters specifically." Id. at 551–52. Consequently, the United States Court of Appeals for the Fourth Circuit reviewed the Policy under intermediate scrutiny and ultimately held that it did not violate the First Amendment. Id. at 555.

---

[5] Ross also brought false arrest and false imprisonment claims against Officer Early. Ross III, 899 F.Supp.2d at 418.

# II. DISCUSSION

## A. <u>Standard of Review</u>

The purpose of a motion under Federal Rule of Civil Procedure 12(b)(6) "is to test the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." <u>King v. Rubenstein</u>, 825 F.3d 206, 214 (4th Cir. 2016) (quoting <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 243–44 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. <u>Goss v. Bank of America, N.A.</u>, 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting <u>Walters v. McMahen</u>, 684 F.3d 435, 439 (4th Cir. 2012)), <u>aff'd sub nom.</u> <u>Goss v. Bank of America, NA</u>, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual

allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cty., 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

## B.   **Analysis**

The City and BPD advance several arguments for dismissing the Second Amended Complaint. First, BPD contends that it is not a "person" under § 1983 and that it is entitled to Eleventh Amendment immunity. Second, the City maintains that it cannot be held liable for BPD's or BPD officers' conduct. Third, they assert that Lucero either fails to state a claim or fails to sufficiently allege Monell claims under § 1983.

### 1.   **BPD's Liability under § 1983**

BPD asserts that it cannot be held liable under § 1983 for two reasons: (1) it is not a "person" for the purposes of § 1983; and (2) it is entitled to Eleventh Amendment immunity. The Court addresses BPD's arguments in turn.

#### a.   **"Person"**

BPD contends that it is a State agency, not an agency of the City of Baltimore, and is therefore not a "person" under § 1983. In essence, BPD maintains that because states are not "persons" under § 1983 and BPD is a state agency, it, too, is not a "person" subject to suit. Lucero disputes this contention.

BPD points to § 1983 and <u>Will v. Michigan Department of State Police</u>, 491 U.S. 58, 71 (1989), for the proposition that a state is not a "person" under § 1983, and because BPD is a state agency, it also is not a "person." BPD does not, however, cite any federal court cases that support this proposition. Indeed, this Court has repeatedly held that BPD is a "person" subject to suit under § 1983. <u>See, e.g.</u>, <u>Chin v. City of Baltimore</u>, 241 F.Supp. 2d 546, 548 (D.Md. 2003) ("[T]he Baltimore Police Department is a 'person' subject to suit under § 1983."); <u>Hector v. Weglein</u>, 558 F.Supp. 194 (D.Md. 1982) (concluding that the BPD is amendable to suit under § 1983). The Court agrees with these conclusions.

Nevertheless, relying on <u>Estate of Anderson v. Strohman</u>, 6 F.Supp.3d 639, 644 (D.Md. 2014), BPD attacks this Court's holdings <u>Hector</u> and <u>Wilcher v. Curley</u>, 519 F.Supp. 1 (D.Md. 1980), which concluded that BPD is too connected to the City to avoid liability under § 1983. <u>Hector</u>, 558 F.Supp. at 199 (holding that BPD is "sufficiently city-connected so as not to be entitled to the claimed Eleventh Amendment protection"); <u>Wilcher</u>, 519 F.Supp. at 5 (concluding that BPD was not entitled to Eleventh Amendment immunity because it was sufficiently connected to the City, not the state). BPD contends that it cannot be so connected to the City for it to be a "person" under § 1983 while at the same time the City is not sufficiently connected to BPD to be held liable for BPD officers' conduct. The Court is not persuaded.

In <u>Estate of Anderson</u>, the Court addressed the City's liability under § 1983 and state law for BPD officers' conduct. 6 F.Supp. 3d at 644–46. Because the City "sets no policy or custom that Baltimore police officers execute," the Court concluded that

"[m]unicipal liability under <u>Monell</u> cannot attach to the City for the unconstitutional actions of Baltimore police officers." <u>Id.</u> at 646. BPD argues that because BPD employees are state employees and because the City does not set any policies or practices for BPD, BPD and the City are not sufficiently connected for liability to attach under § 1983.

Here, BPD overlooks the cases that post-date <u>Wilcher</u> and <u>Hector</u> that specifically address the issue of whether BPD is a "person" subject to liability under § 1983. Since <u>Wilcher</u> and <u>Hector</u>, this Court decided <u>Chin</u>, in which it reiterated that as a "local government entity" BPD is a "'person' subject to suit under § 1983." 241 F.Supp.2d at 548–49. Since <u>Chin</u>, this Court has repeatedly affirmed its holding. <u>See, e.g.</u>, <u>Fish v. Mayor of Baltimore</u>, No. CCB-17-1438, 2018 WL 348111, at *3 (D.Md. Jan. 10, 2018) ("[T]he court determines BPD is not entitled to Eleventh Amendment immunity and, as a result, is a 'person' subject to suit under § 1983."); <u>Rockwell v. Mayor of Baltimore</u>, No. RDB-13-3049, 2014 WL 949859, at *11 (D.Md. Mar. 11, 2014) (collecting cases) ("As the weight of authority from this Court indicates, the Baltimore Police Department is not a state agency for Eleventh Amendment purposes and, therefore, can be held liable under § 1983."). Further, as this Court has explained, "whether there are sufficient connections between [BPD] and the [City] to preclude a claim of sovereign immunity by [BPD]," and, as a result, is not a "person" under § 1983, "is a different question from whether the City controls [BPD] to establish <u>Monell</u> liability, even if they may rely on some of the same facts." <u>Dale v. Mayor</u>, No. WDG-14-2152, 2015 WL 5521815, at *4

(D.Md. Sept. 15, 2015). These analyses "should not be collapsed into one." Id. BPD attempts to do just that. The Court rejects this attempt.

In sum, the Court concludes that BPD is a "person" under § 1983. The Court will, therefore, deny BPD's Motion on this basis.

### b.    Eleventh Amendment Immunity

BPD contends that, as a state agency, it is immune from suit under the Eleventh Amendment. The Court disagrees.

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." U.S. Const. amend. XI. Notwithstanding the Eleventh Amendment's explicit mention of only "Citizens of another State," the Supreme Court of the United States has construed the Eleventh Amendment as also protecting states from federal court suits brought by the state's own citizens. Id.; Lee-Thomas v. Prince George's Cty. Pub. Sch., 666 F.3d 244, 248 (4th Cir. 2012) (quoting Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 304 (1990)). The States' immunity extends to "state agents and instrumentalities." Id. (quoting Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429 (1997)).

To determine whether an entity is a state agent or instrumentality, and therefore is entitled to Eleventh Amendment immunity, courts apply the "arm-of-the-State" analysis. See Owens v. Baltimore City State's Attorneys Office, 767 F.3d 379, 395 n.5 (4th Cir.

2014). This analysis examines four nonexclusive factors: (1) "whether any judgment against the entity as defendant will be paid by the State or whether any recovery by the entity as plaintiff will inure to the benefit of the State"; (2) "the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions"; (3) "whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns"; and (4) "how the entity is treated under state law, such as whether the entity's relationship with the State is sufficiently close to make the entity an arm of the State." U.S. ex rel. Oberg v. Kentucky Higher Educ. Student Loan Corp., 681 F.3d 575, 580 (4th Cir. 2012) (quoting S.C. Dep't of Disabilities & Special Needs v. Hoover Universal, Inc., 535 F.3d 300, 303 (4th Cir. 2008)). In Owens, the Fourth Circuit explained that the Supreme Court previously held that the first factor was most important, but has since "abandoned this view." 767 F.3d at 395 n.5. Accordingly, the Court "must also consider at least three other factors—the degree of autonomy exercised by an entity, whether an entity is involved with state concerns, and how an entity is treated under state law—without giving preeminence to any single factor." Id.

BPD argues that applying the arm-of-the-State factors to BPD shows that it is a State agency for the purposes of the Eleventh Amendment.[6] The Court disagrees. BPD overlooks

_____

[6] BPD, citing Garner v. Harper, No. GLR-11-1919, 2012 WL 3263848, at *3 (D.Md. Aug. 8, 2012) contends, "At least once, this Court has granted BPD Eleventh Amendment immunity. (BPD's Mot. at 8). BPD's argument misses the mark. Garner involved an unrepresented litigant who sued BPD and individual officers for an alleged assault that occurred during his arrest. Garner, 2012 WL 3263848, at *1. BPD and the individual

11

this Court's holding in <u>Alderman v. Baltimore City Police Department</u>, 952 F.Supp. 256 (D.Md. 1997).

In <u>Alderman</u>, this Court applied the arm-of-the-State analysis to BPD and concluded that it was not entitled to Eleventh Amendment immunity. <u>Id.</u> at 258. To be sure, this Court decided <u>Alderman</u> when the primary factor was whether any judgment would be paid from the State treasury—and concluded that this factor alone was dispositive. <u>Id.</u> (citing <u>Harter v. Vernon</u>, 101 F.3d 334, 338 (4th Cir. 1996)). This Court further concluded, however, that the other three factors also weighed against concluding that BPD is an arm of the state, and, as a result, that BPD was not entitled to Eleventh Amendment immunity. <u>Id.</u> at 259. With regard to the second factor, this Court noted that the City "exercises a significant degree of control" over BPD, including determining how many employees to hire, reviewing employment applications, setting employee salaries, offering medical insurance, and providing legal representation. <u>Id.</u> at 258. As to the third factor, this Court concluded that BPD's functions are "unquestionably local." <u>Id.</u> (quoting <u>Hess v. Port Auth. Trans-Hudson Corp.</u>, 513 U.S. 30, 44 (1994)). With regard to the fourth factor, this Court rejected BPD's reliance on state court decisions concluding that it is a state agency, citing the Fourth

_____

officers filed motions to dismiss, which the Court granted unopposed. <u>Id.</u> In its discussion regarding Eleventh Amendment immunity, the Court does not specify the claims to which it applies. <u>See id.</u> at *3. Thus, the Court does not read <u>Garner</u> to necessarily stand for the proposition that Eleventh Amendment immunity prevents BPD from being held liable under § 1983. Further, given the case law, discussed above, concluding that BPD is not entitled to Eleventh Amendment immunity, the Court declines to hold based on a single unpublished opinion that Eleventh Amendment immunity shields BPD from suit under § 1983.

Circuit's admonishment to federal courts regarding cases "that have mistakenly treated a state court decision as to whether an entity is a state actor as determinative." (quoting <u>Harter</u>, 101 F.3d at 342). Besides the Fourth Circuit noting that the first factor is no longer the most important one, BPD gives the Court no reason to depart from <u>Alderman</u> and the Court finds none.

Thus, the Court concludes that BPD is not an arm of the State and, consequently, is not entitled to Eleventh Amendment immunity. Accordingly, the Court will deny BPD's Motion on this ground.

### 2. <u>Monell</u> Claims

Under <u>Monell v. Department of Social Services</u>, municipalities and units of local government are subject to suit under § 1983. 436 U.S. 658, 690 (1978). A plaintiff may sue a municipality under § 1983 if he suffered a constitutional violation at the hands of an employee acting under color of a municipal policy. <u>Id.</u> at 692. Under <u>Monell</u>, however, "a municipality is liable only for its own illegal acts." <u>Owens v. Balt. City State's Attorney's Office</u>, 767 F.3d 379, 402 (4th Cir. 2014). As a result, "[o]nly if a municipality subscribes to a custom, policy, or practice can it be said to have committed an independent act, the <u>sine qua non</u> of <u>Monell</u> liability." <u>Id.</u> Put differently, if "'a policy statement, ordinance, regulation, or decision officially adopted and promulgated' by a municipality's officers directly caused a constitutional violation, then the municipal body may be sued directly." <u>Ashby v. Isle of Wight Cty. Sch. Bd.</u>, 354 F.Supp.2d 616, 625 (E.D.Va. 2004) (quoting

Monell, 436 U.S. at 690). <u>Respondeat superior</u> liability is insufficient under <u>Monell</u>'s standard. <u>Monell</u>, 436 U.S. at 693–94.

All § 1983 <u>Monell</u> claims have three elements: "(1) identifying the specific 'policy' or 'custom'[;] (2) fairly attributing the policy and fault for its creation to the municipality; and (3) finding the necessary 'affirmative link' between identified policy or custom and specific violation." <u>Spell v. McDaniel</u>, 824 F.2d 1380, 1389 (4th Cir. 1987), <u>cert. denied sub nom. City of Fayetteville v. Spell</u>, 484 U.S. 1027 (1988); <u>see also</u> <u>Jones v. Chapman</u>, No. ELH-14-2627, 2015 WL 4509871, at *12 (D.Md. July 24, 2015) ("[A] municipality is liable when a policy or custom is fairly attributable to the municipality as its own, and is . . . the moving force behind the particular constitutional violation." (citation omitted)).

A plaintiff may allege four types of customs, policies, or practices: (1) the "decisions of a government's lawmakers;" (2) "the acts of its policymaking officials;" (3) "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights," known as a "failure to train" claim; and (4) "practices so persistent and widespread as to practically have the force of law," known as a condonation claim. <u>Connick v. Thompson</u>, 563 U.S. 51, 61 (2011).

"Although prevailing on the merits of a <u>Monell</u> claim is difficult, simply alleging such a claim is, by definition, easier." <u>Owens</u>, 767 F.3d at 403. To sufficiently state a <u>Monell</u> claim under Rule 12(b)(6), a plaintiff "need only allege facts which, if true, 'state a claim to relief that is plausible on its face.'" <u>Id.</u> (quoting <u>Iqbal</u>, 556 U.S. at 678). The complaint's facts "need not be particularly detailed, and the chance of success need not be

particularly high." Id. "A plaintiff fails to state a claim only when he offers 'labels and conclusions' or formulaically recites the elements of his § 1983 cause of action." Id. (quoting Iqbal, 556 U.S. at 678).

Here, Lucero alleges the second and fourth types of customs, policies, or practices— the acts of policymaking officials and a persistent and widespread practice of violating citizens' constitutional rights. Lucero brings the second type of Monell claim against the City and BPD in Count 2; he brings the fourth type against BPD only in Count 3.[7] The Court first addresses Lucero's claim premised on the second type of Monell custom, policy, or practice.

### a. Acts of Policymaking Officials Claim (Count 2)

Both BPD and the City maintain that Lucero fails to state a § 1983 Monell claim based on the acts of policymaking officials because Lucero fails to allege that BPD or City official with final policymaking authority adopted the Policy. The Court disagrees.

A municipality is not "automatically subject[ed]" to § 1983 liability for "every decision by municipal officers." Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986) (plurality). Rather, a municipality may be liable "only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." Lane v. Anderson, 660 F.App'x 185, 197 (4th Cir. 2016) (quoting Pembaur, 475 U.S. at 481). A

---

[7] Lucero also arguably pleads the third type of Monell claim—failure to train. In the Second Amended Complaint he alleges a "failure to correct." (2d Am. Compl. ¶ 78). Lucero does not allege, however, the constitutional rights about which BPD failed to train its officers or in what ways BPD's training was deficient. Accordingly, the Court construes Count 3 as alleging only a widespread custom or practice type of Monell claim.

decisionmaker with final policymaking authority is an individual who has "the responsibility and authority to implement final municipal policy with respect to a particular course of action." Lytle v. Doyle, 326 F.3d 463, 472 (4th Cir. 2003) (quoting Riddick v. Sch. Bd. of Portsmouth, 238 F.3d 518, 523 (4th Cir. 2000)). Put another way, a decisionmaker possesses "final authority" to set a particular policy when "no further action is needed for the policy to take effect." Liverman v. City of Petersburg, 844 F.3d 400, 413 (4th Cir. 2016). To determine which officials have final policymaking authority for the challenged policy, the Court considers "the relevant legal materials, including state and local positive law, as well as 'custom or usage having the force of law.'" Riddick, 238 F.3d at 523 (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989)). Further "[a] policy or custom need not receive 'formal approval through the municipality's official decision-making channels to subject the municipality to liability.'" Lytle, 197 F.Supp.2d at 493 (quoting Riddick, 238 F.3d at 522).

The City contends that Chief Solicitors do not have final policymaking authority over the conduct of BPD officers. Specifically, the City posits, because the City Solicitor is not a final policymaker, neither are his subordinates, Chief Solicitors Linda Barclay and Elena DiPietro. Likewise, BPD asserts that only the Commissioner has final policymaking authority under state law, and therefore, Lucero's allegations that the Chief of the BPD Law Department; BPD's second-in-command, Anthony Barksdale; and then-BPD

Commissioner, Leonard Hamm were involved in developing and implementing the Policy are insufficient.[8]

Here, Lucero alleges that Barclay "created" the Policy in 2004, that she "continued" it through 2008, and that DiPietro "continued" it until 2010. (See 2d Am. Compl. ¶ 27). Lucero further alleges that "City Solicitors have final decision-making authority-in-fact over matters under their purview, including the Policy at issue here." (Id.). "BPD Command Staff" were allegedly "involved in creation of the Policy" and "designated BPD supervisors," including Barksdale and Hamm, "have final decision-making authority-in-fact over matters under their purview, including the Policy at issue here." (Id. ¶ 28). In addition, these "designated BPD supervisors" either "implemented the Policy or through actual or constructive notice caused it to be implemented." (Id.). It is true that the Court looks to "state and local positive law" to determine whether an official has final policymaking authority, which, in this case, does not vest any officials besides the Commissioner and the Chief Solicitor with final decision-making authority. But the Court also considers 'custom or usage having the force of law.'" Riddick, 238 F.3d at 523

_____

[8] Both the City and BPD also argue that Lucero's allegations that the Chief Solicitor, City Solicitors, and "BPD Command Staff," including the Commissioner, "presumptively received," (2d Am. Compl. ¶¶ 27–28), emails regarding the Policy are insufficient to establish that the City or BPD implemented or ratified it. Defendants misconstrue Lucero's allegations. Lucero does not plead that Defendants only received emails regarding the Policy. Rather, Lucero alleges that Chief Solicitor Barclay "created" the Policy, "BPD Command Staff," including the Commissioner, "were involved in the creation of" the Policy, and that "designated BPD supervisors," including the Commissioner, "reviewed" the Policy. (Id.). The allegations related to the emails illustrate that these individuals were involved in developing and implementing the Policy.

(quoting Jett, 491 U.S. at 737). In this case, Lucero alleges that BPD and City officials jointly formulated the Policy in 2004 and continued that Policy through 2010 when the Circus ended. Thus, at this stage in the litigation, Lucero plausibly alleges a "custom or usage having the force of law" in which BPD and City officials collaborated to create and enact the Policy.[9] In reaching this conclusion, the Court notes that the Policy did not need "formal approval through the municipality's official decision-making channels" for it to be a municipal policy under § 1983. Lytle, 197 F.Supp.2d at 493 (quoting Riddick, 238 F.3d at 522).

The City also argues that Barclay and DiPietro were acting within the policymaking authority the City Solicitor delegated to them when they responded to BPD's request for legal advice with a recommendation. The Court is not persuaded for at least two reasons. First, the City attempts to re-cast the allegations in the Second Amended Complaint to characterize Barclay's and DiPietro's conduct as something other than what Lucero expressly pleads. At the motion to dismiss stage, however, the Court considers only the facts as alleged in the Second Amended Complaint and takes them to be true. Because Lucero alleges that Barclay and DiPietro worked jointly with BPD to develop the Policy,

---

[9] Further, the cases addressing whether an individual had final decision-making authority were at the summary judgment stage, and therefore, the courts had evidence before them as to the local custom or usage regarding final decision-making authority. See Hunter v. Town of Mocksville, N. Carolina, 897 F.3d 538, 555–56 (4th Cir. 2018) (noting that town board delegated decision-making authority to town manager, who exercised that authority without oversight from the board as a matter of custom); Riddick, 238 F.3d at 523. Here, at this stage in the litigation, the Court does not have the benefit of such information.

the Court takes his allegations as true. Second, in <u>Ross III</u>, this Court rejected this very argument, stating that it had "already disposed of defendants' argument that the protocol constituted only 'legal advice,' which would shield them from § 1983 liability." 899 F.Supp.2d at 419 n.5. At this stage in the litigation, the Court agrees.

The City next contends that Lucero fails to allege conduct attributable to the City that caused a constitutional violation. In support of its argument, the City cites to the Baltimore City Charter, which in relevant part, provides, that "no ordinance of the City or act of any municipal officer . . . shall conflict, impede, obstruct, hinder or interfere with the powers of the Police Commissioner." Balt. City Charter, Art. II, § 27 (2019). Lucero counters that he alleges a joint policy between the City and BPD, and therefore, it did not violate Art. II, § 27 of the Baltimore City Charter. Lucero also notes that the Baltimore City Charter grants the City the power to "regulate the use of streets and public ways," Balt. City Charter, Art. II, § 34(d) (2019), which is what the Policy does.

Here, while it is true that "the City does not sufficiently control the BPD to be responsible for Baltimore police officer conduct under § 1983 (i.e., they are not City employees)," <u>Estate of Anderson</u>, 6 F.Supp.3d at 644, and therefore, the City cannot be held liable for BPD officers' unconstitutional conduct, Lucero alleges that the City and BPD developed and implemented the Policy, not that Officer Early was enforcing a policy the City alone enacted. In addition, Lucero alleges that an incident with a media van precipitated the City's development of the Policy for the Arena, a City-owned property. (2d Am. Compl. ¶ 16). Lucero further pleads that Officer Early was off duty and working

for his own private security company when he enforced the Policy against Lucero. (Id. ¶¶ 22, 43). Thus, the Court can plausibly infer that the City developed and implemented the Policy.

Finally, the City argues that Lucero fails to allege an unconstitutional City custom enforced with deliberate indifference. To support this contention, the City cites to the Fourth Circuit's holding in Ross that the Policy was a "permissible time, place, and manner restriction on speech" that "comports with the First Amendment." 746 F.3d at 560. In Ross, however, the parties stipulated that the Policy applied generally to "all expressive activity" and not to "the activities of circus and animal welfare street protesters specifically." Id. Here, by contrast, the parties have not stipulated that the Policy applies generally to all expressive activity. Rather, Lucero alleges that the Policy specifically applied to anti-Circus protestors. (2d Am. Compl. ¶¶ 14, 23, 37, 38–40) ("The Policy was targeted at 'those who wish to express their views about the Circus' and controlled 'protestors' ('any protestors will be asked to move'), which in the context of the Policy referred to anti-Circus protestors."). Put another way, Lucero alleges that the Policy was not content-neutral, and therefore, it was an impermissible infringement on his First Amendment rights. In addition, Lucero alleges that the City was either actually or constructively aware of the Policy because of the Ross litigation. These allegations, taken together, at this stage of the litigation, are sufficient to state a Monell claim against the City.

In sum, the Court concludes that Lucero plausibly alleges a <u>Monell</u> claim based on the acts of policymaking officials.[10] Accordingly, the Court will deny BPD's Motion and the City's Motion to the extent they seek to dismiss Count 2 of the Second Amended Complaint.

**b.    Condonation Claim (Count 3)**

BPD maintains that the Second Amended Complaint contains no factual allegations of a widespread custom or practice or that BPD was deliberately indifferent to Officer Early's discriminatory enforcement of the Policy. The Court disagrees.

"Under th[e] [condonation] theory of liability, a city violates § 1983 if municipal policymakers fail 'to put a stop to or correct a widespread pattern of unconstitutional conduct.'" <u>Owens</u>, 767 F.3d at 402 (alterations in original) (quoting <u>Spell</u>, 824 F.2d at 1390). The pattern of unconstitutional conduct must be "so permanent and well settled as to constitute a 'custom or usage' with the force of law." <u>Carter v. Morris</u>, 164 F.3d 215, 218 (4th Cir. 1999) (quoting <u>Monell</u>, 436 U.S. at 691). Generally, bringing a condonation

---

[10] The City also contends that because the Fourth Circuit in <u>Ross</u> concluded that the City Solicitors were entitled to qualified immunity, that the City could not have been deliberately indifferent because Lucero's rights were not clearly established. The City's argument misses the mark for at least two reasons. First, as addressed above, unlike <u>Ross</u>, Lucero alleges that the Policy was not content-neutral. Second, the City conflates deliberate indifference under <u>Monell</u> with the need for a constitutional right to be clearly established to overcome qualified immunity. Qualified immunity holds that even though a government official violated a citizen's constitutional rights, he or she is immune from suit. <u>See</u> <u>Torchinsky v. Siwinski</u>, 942 F.2d 257, 261 (4th Cir. 1991) (quoting <u>Collinson</u>, 895 F.2d at 998). Thus, concluding that a government official is entitled to qualified immunity does not preclude a determination that he or she was deliberately indifferent to a citizen's constitutional rights.

claim requires a plaintiff to prove "a 'persistent and widespread practice of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" Owens, 767 F.3d at 402 (quoting Spell, 824 F.2d at 1391). Both elements "can be inferred from the 'extent' of employees' misconduct." Id. (quoting Spell, 824 F.2d at 1391). Only "widespread or flagrant" misconduct is sufficient. Id. at 403 (quoting Spell, 824 F.2d at 1387). "Sporadic or isolated" misconduct is not. Id. Further, the Court will not infer a Monell custom from municipal inaction in the face of "isolated constitutional deprivations by municipal employees." Sutton v. Billings, No. ELH-16-3364, 2017 WL 2335555, at *7 (D.Md. May 26, 2017) (quoting Milligan v. City of Newport News, 743 F.2d 227, 230 (4th Cir. 1984)).

While proving a condonation claim "is no easy task," alleging a condonation claim is, "by definition, easier." Owens, 767 F.3d at 403. To survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only support his condonation claim with facts which, if true, "state a claim to relief that is plausible on its face." Id. (quoting Iqbal, 556 U.S. at 678). The facts "need not be particularly detailed," and a plaintiff fails to state a condonation claim "only when he offers 'labels and conclusions' or formulaically recites the elements" of his condonation claim. Id. (quoting Iqbal, 556 U.S. at 678). "[G]eneral averments of an unconstitutional policy or custom" paired with "particular examples" are sufficient to survive dismissal. Jones, 2015 WL 4509871, at *17.

In <u>Owens,</u> the plaintiff pleaded that "reported and unreported cases" established that BPD had a custom, policy, or practice of "suppressing exculpatory evidence in criminal prosecutions" and that "numerous successful motions" challenging such suppressions demonstrated that BPD knew of the evidence suppression and condoned it. <u>Id.</u> at 402–03. The Fourth Circuit held that the cases and motions were factual allegations supporting the plaintiff's condonation claim. <u>Id.</u> The court further held that the plaintiff's assertion that BPD withheld such evidence on "multiple occasions could establish a 'persistent and widespread' pattern of practice." <u>Id.</u>

Here, Lucero alleges that BPD officers employed a "widespread custom" of only enforcing the Policy "against those who oppose the Circus." (2d Am. Compl. ¶ 51). He states that Officer Early testified that in 2008 and 2009 he "enforced the Policy against anti-Circus leafletters specifically because they were 'protestors' within the meaning of the Policy." (<u>Id.</u> ¶ 52). Lucero provides additional examples of discriminatory enforcement of the Policy, including that Officer Early told a leafletter he arrested that "he would have shown her more sympathy if she had been promoting a human cause such as homelessness" and that Officer Early and other BPD officers "regularly declined to enforce the Policy against persons who were openly leafletting other issues, but consistently and regularly enforced it against anti-Circus leafletters." (<u>Id.</u> ¶¶ 55a, 55e). These are factual allegations that, if documented during discovery, could support a <u>Monell</u> claim. <u>Owens,</u> 767 F.3d at 403.

As to deliberate indifference, Lucero alleges that BPD was aware that Officer Early was enforcing the Policy in a discriminatory manner because it was served with the <u>Ross</u> complaint on November 9, 2009. (2d Am. Compl. ¶ 54). Lucero further alleges that after receiving a copy of the <u>Ross</u> complaint, BPD "through deliberate indifference and inaction allowed and caused the discriminatory enforcement to continue during the 2010 Circus against Lucero." (<u>Id.</u>). These allegations are sufficient, at this stage in the litigation, to establish that BPD was deliberately indifferent to Officer Early's purported discriminatory enforcement of the Policy. <u>See, e.g.</u>, <u>Smith v. Aita</u>, No. CCB-14-3487, 2016 WL 3693713 at *4 (D.Md. July 12, 2016) (holding, at the Rule 12(b)(6) stage, that it was "enough that Smith has alleged that Salisbury was aware of ongoing constitutional violations by Salisbury police officers and did nothing to stop or correct those actions, thereby allowing an unconstitutional pattern to develop"); <u>Garcia v. Montgomery Cty.</u>, No. JFM-12-3592, 2013 WL 4539394 at *5, 2013 U.S. Dist. LEXIS 120659 at *14 (D.Md. Aug. 23, 2013) (holding that the plaintiff stated a viable <u>Monell</u> claim against the county where the plaintiff alleged that the county "was aware of unconstitutional actions by [police] officers directed towards members of the media but chose to ignore such behavior").

In short, the Court concludes that Lucero adequately alleges a widespread custom or practice of discriminatory enforcement of the Policy. Accordingly, the Court will deny BPD's Motion as to Count 3.

### III.   CONCLUSION

For the foregoing reasons, the Court will deny the City's Motion to Dismiss Count Two of the Second Amended Complaint (ECF No. 79) and BPD's Motion to Dismiss Plaintiff's Second Amended Complaint (ECF No. 80). A separate order follows.

Entered this 25 day of September, 2019.

_____/s/_____
George L. Russell, III
United States District Judge